**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| CATHYE HARDY WILSON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civil Action No.: ________________<br><br>**COMPLAINT** |

Plaintiff Cathye Wilson (hereinafter "Plaintiff" or "Ms. Wilson"), by and through her undersigned counsel, brings this action against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, and alleges as follows:

## INTRODUCTION

1. This action arises from the crash of a United States Marine Corps ("USMC") F-35B fighter jet on Plaintiff's 107-acre mixed-use property in Williamsburg County, South Carolina, on September 17, 2023. According to the USMC, the crash was caused by pilot error and resulted in the discharge of up to 1,000 gallons of toxic jet fuel and other hazardous substances onto Plaintiff's land, destruction of agriculture and timber resources, contamination of soil and potentially water, and caused and continues to cause Plaintiff the deprivation of use of her property. The United States' remediation efforts were inadequate, leaving Plaintiff's property with residual contamination, aircraft debris, and unresolved environmental damage.

2. This is an action for damages associated with these injuries, as contemplated under the Federal Tort Claims Act and pursuant to the protections of the United States Constitution.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b)(1), which grants exclusive jurisdiction to the United States District Courts over civil actions against the United States for money damages based on injury or loss of property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

4. Venue is proper in this District pursuant to 28 U.S.C. § 1402(b) because the acts and omissions giving rise to this action occurred in Williamsburg County, South Carolina.

5. Plaintiff has satisfied all prerequisites to filing suit under the FTCA. On September 8, 2025, Plaintiff submitted a Standard Form 95 ("SF-95") and accompanying claim letter to the Department of the Navy, Office of the Judge Advocate General, Tort Claims Unit Norfolk. The claim was received by the Department of the Navy on September 9, 2025.

6. On February 9, 2026, the Department of the Navy sent correspondence requesting additional documentation and acknowledged that "extended government shutdown[s]" had caused delays in processing the claim.

7. More than six months have elapsed since the filing of the administrative claim, and the agency has failed to make a final disposition of the claim. Thus, pursuant to 28 U.S.C. § 2675(a), Plaintiff has exhausted her administrative remedies and this Court has jurisdiction to decide this lawsuit.

## PARTIES

8. Plaintiff Cathye Wilson is a civilian resident of Florence, South Carolina, and is the owner of the approximately 107-acre tract of property located in Williamsburg County, South Carolina, identified by Williamsburg County Plats 45-389-025, 45-389-023, 45-389-026, 45-389-021, 45-389-020, 45-389-019, and 45-389-018 (the "Wilson Tract" or "Property").

9. Defendant is the United States of America, which is liable for the tortious acts and omissions of its employees, including military personnel of the United States Marine Corps ("USMC") and United States Department of the Navy ("DON"), acting within the scope of their employment, pursuant to 28 U.S.C. § 2674.

## FACTUAL ALLEGATIONS

### *The F-35B Crash*

10. On September 17, 2023, Colonel Charles Del Pizzo was piloting a United States Marine Corps F-35B fighter jet in the vicinity of North Charleston, South Carolina.

11. According to the final report issued by the USMC, Col. Del Pizzo ejected from the aircraft after he attempted to land at Joint Base Charleston during a lightning storm.

12. Prior to ejecting, the aircraft and Col. Del Pizzo's helmet suffered several system failures. According to Col. Del Pizzo, these failures caused disorientation, leading to his inability to ascertain his relationship to the ground.

13. Despite these system failures, however, the USMC determined that the aircraft remained flyable. Indeed, in a news release, the USMC stated: "The pilot incorrectly diagnosed an

out-of-controlled flight emergency and ejected from a flyable aircraft, albeit during a heavy rainstorm compounded with aircraft electrical and display malfunctions."[1]

14. The aircraft flew on its own for eleven (11) minutes after Col. Del Pizzo's ejection, further evidencing that ejection was improper.

15. The USMC determined that Col. Del Pizzo was responsible for the crash, finding that the cause of the crash was "pilot error."

16. The F-35B crashed approximately 60 miles away in a rural, wooded section of the Wilson Tract in Williamsburg County, South Carolina.

17. The pilot, Col. Del Pizzo, is an "employee of the government" within the meaning of 28 U.S.C. § 2671.

18. The crash undisputedly caused property and economic damage.

***Hazardous Materials Released***

19. At the time of the crash, the F-35B was carrying between 420 – 1,000 gallons of Jet-A aviation fuel and approximately 15 gallons of hydraulic and lubricating oil. The crash discharged these materials upon the land immediately surrounding the impact.

20. As referenced in the Emergency Removal and Remediation report, in addition to petroleum hydrocarbons, the aircraft itself was constructed of and carrying other unknown substances, which were also discharged into the ground.

21. The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq*., mandates that, in certain circumstances, the government

---

[1] *See* "Marines say Crashed F-35B Malfunctioned, but Pilot Didn't Need to Eject," Jeff Schogol, Oct. 31, 2024, Task & Purpose, available at: https://taskandpurpose.com/news/f-35-crash-south-carolina-investigation/ (last accessed August 19, 2026).

is responsible for the removal of pollutants and contaminants from specific sites. *See also* 42 U.S.C. § 9607.

22. In addition, the Fifth Amendment to the United States Constitution provides that private property may not be taken by the government without just compensation. U.S. Const. amend. V.

23. Under the framework established by CERCLA, which the DON and other responsible parties have adopted, when an event requires the government to initiate a removal and/or remediation action, the entity must assign an onsite case manager and prepare an Action Memorandum ("AM"). *See* DON Environmental Restoration Program Manual; *see also* Superfund Removal Guidance for Preparing Action Memorandum (available at https://www.epa.gov/emergency-response/superfund-removal-guidance-preparing-action-memoranda) (last accessed August 19, 2026).

24. The AM sets forth the type of action, the basis for the action, and the conditions and contaminants requiring a response.

25. The AM includes an objective purpose for the action, the classification of the action, including whether the action is considered emergent, the necessity for addressing the release, and a justification for a federal response, including a determination that the pollutant(s) and/or contaminant(s) impacting a site threaten public health and welfare, and the environment.

26. The AM then provides a plan for removal with the associated costs and action steps necessary, including the need for samples, the type of samples, and the time, place, and manner of removal and remediation.

27. This plan memorializes how to address the very real harm to human health and environmental resources caused by the contamination.

28. In the instance of contamination on private property, the AM is also critical to ensure the protection of private citizens' fundamental rights.

29. Upon a determination that removal and/or remediation is necessary based upon the threat of harm to the public welfare and the environment, the removal action must occur pursuant to the clean-up standards in the AM, which incorporates federal and state statutes and regulations, risk levels, and land use assumptions.

30. Under this framework, an emergency removal action is a required expedited response to address contamination and/or pollutant releases that pose substantial danger to public health and welfare.

31. Following removal, a remediation action may be necessary and includes a proposed response that prescribes how the removal activities will abate, prevent, minimize, stabilize, mitigate, or eliminate the potential harm.

32. Once the plan is established, the government may not deviate from this plan.

33. In addition, in instances where the proposed response will exceed $2 million, the response must be escalated up the chain of command for approval and justified by sufficient need. In these instances, the response action is even more critical.

34. The proposed response is incorporated into the AM and must satisfy certain procedural requirements.

35. This crash required emergency removal and remediation actions.

36. In response to this crash, the DON's initial point of contact, Sarah Murtagh, estimated that up to 1,000 gallons of jet fuel as well as "other unknown substances"[2] were discharged upon the Property.

37. The known contaminants of concern ("COCs") associated with the incident consisted of petroleum hydrocarbons associated with Jet-A aviation fuel, hydraulic oil, lube oil, and microplastics.

38. Jet fuel[3] is highly toxic, containing petroleum hydrocarbons and other chemicals that are harmful to property and the environment. Likewise, microplastics can degrade environmental quality by contaminating ecosystems, harming plant growth, and introducing toxic substances that threaten human health and long-term land usability.

39. In addition, the initial evaluation of the crash site did not rule out that the crash caused the dispersion of other contaminants, for example, per- and polyfluoroalkyl ("PFOA" and "PFAS") and related substances.

40. PFAS and PFOA, commonly referred to as "forever chemicals," are so-designated because of the duration of time required for the substances to break down. These chemicals are linked to various health conditions including cancer, and endocrine disruption.

41. These substances are routinely utilized in aircraft manufacturing and aerospace engineering due to their exceptional resistance to heat and friction.

---

[2] Information about the aircraft and crash were withheld from the public even in the final reports given the stealth technology at issue.

[3] Notably, jet fuel is exempt from removal actions under CERCLA. Given this exemption, and the need for emergency removal, the contaminants of concern requiring DON intervention were something other than jet fuel.

***Government Response and Remediation Activities***

42. Control, containment, and cleanup of spills are paramount in the DON's efforts to maintain a clean environment. Following a contaminating event, the DON utilizes a three-tiered system and further follows the parameters of federal law in responding to the event.

43. Following notification of the incident, the Navy On-Scene Coordinator ("OSC") coordinated internal response efforts.

44. The OSC provides emergency response and consequence management services for Navy and USMC incidents that may have an environmental or health impact and ensures the restoration of resources in compliance with environmental laws.

45. Given the circumstances of the crash, including the likely release of dangerous contaminants, the OSC determined that an emergency environmental response was necessary.

46. Other agencies involved in the response included the then-South Carolina Department of Health and Environmental Control ("DHEC"), the National Response Center ("NRC"), the Centers for Disease Control ("CDC"), the Department of Health and Human Services, the Agency on Toxic Substances, the Office of Environmental Policy and Compliance, and the Federal Aviation Administration.

47. The Navy contracted Moran Environmental Recovery, Inc. ("MER") to coordinate the recovery and transportation of the aircraft and associated debris, remediation activities, and restoration of the incident site. The Navy also engaged CTEH, LLC ("CTEH") to perform the environmental assessment and document remediation activities.

48. The Navy issued an Emergency Removal and Remedial Action Report (the "Report") documenting remediation efforts. According to the Report, the total impact area consisted of approximately 112,500 square feet (2.58 acres) of impacted soil, the aircraft debris

recovered filled 47 tri-wall boxes full of debris and 9 pallets of large mechanical pieces, and over 2,000 tons of excavated soil were transported for disposal.

49. Having adopted a removal and remediation plan, Defendant had no judgment or choice as to whether to complete the approved plan.

50. Remediation activities took place over a period of approximately 191 days, during which time Plaintiff's use of the Property was heavily restricted or prohibited altogether.

51. The remediation efforts included the destruction of all agriculture and forestry upon the Property. Vegetation and trees were removed during the clean-up process, large vehicles traversed the Property damaging crops and trails, access roads were created by removing trees and vegetation, staging areas for large equipment were established on the Property, and mulch and gravel were placed on the Property.

52. At the end of the remediation efforts, Plaintiff was never provided specific information about the likely contaminants of concern, how the DON deviated from the plan, or what continued contamination existed upon the property.

***Inadequacy of Remediation***

53. As of today, and as a direct result of the conduct set forth above and below, the Property remains contaminated.

54. On September 23, 2023, the Navy OSC changed the debris retrieval directive from recovering all debris regardless of size to only picking up identifiable debris larger than 1.5 inches in diameter.

55. The OSC provided no justification for this deviation.

56. As a result, debris remains on the Property, and Ms. Wilson and her family continue to find debris.

57. The Report indicates that the DON also limited its environmental assessment to the 2.58-acre area deemed to be directly impacted, yet additional acreage was affected as reflected in the destruction of agricultural and timber resources beyond this radius.

58. Initial soil testing in the cotton field was positive for COCs.

59. The Report does not adequately explain the basis for the testing methodology, the testing thresholds used in assessing COCs, or the testing radius.

60. Despite contamination, the cotton field was exempted from excavation operations due to what the Report characterizes as "landowner concern" for disturbance of agricultural soil. However, the Report provides no proof of this concern, nor does it identify the "landowner" who expressed it.

61. To be sure, Cathye Wilson did not consent to incomplete remediation.

62. Bio-sheen was observed on surface water downstream of the crash site within a few days of the crash, and subsequent observations continued to note bio-sheen and possible oil sheen.

63. While the DON initially found the need for chemical or oil spill and/or fish kill protocol, no fish kill study was performed.

64. The Report also refers to air monitoring that should have been performed during clean up but no air monitoring data samples were taken, and the Report makes no conclusions regarding air quality.

65. Given the nature of the possible contamination, air testing was necessary as part of the remediation plan but was not performed.

66. The Report focuses exclusively on jet fuel and fails to address the "unknown substances" initially referenced in the original correspondence relating to the crash.

67. The Report does not adequately describe the remediation efforts undertaken to address the microplastics that have contaminated the Property, nor efforts to identify or remediate PFOA or PFAS.

68. The Report concluded that no additional remedial efforts were required for soil or water. However, with no basis to deviate from the standards selected for the remediation, without proper testing, and with an insufficient procedure for selecting test sites, this conclusion is severely undermined.

69. In fact, Plaintiff has undertaken to determine the additional and extremely costly testing and remediation required to address the ongoing contamination and risk of contamination upon Ms. Wilson's Property, and this testing and remediation will likely exceed $900,000.

***Damages to Plaintiff's Property***

70. Ms. Wilson's 107-acre Property is a mixed-use farm with both recreational and commercial uses, including agriculture and forestry.

71. In this case it was clear that DON knew the property was currently in use in this manner.

72. DON developed performance specifications, standards, and clean-up levels and incorporated these into the remediation plan.

73. These specifications, standards, and levels were ignored, however, and, instead, the remedial measures undertaken not only failed to appropriately address contamination, but permanently altered the landscape of the Property, with native vegetation and trees removed and replaced with mulch and gravel.

74. Large vehicles traversed the Property damaging crops and trails, access roads were created by removing trees and vegetation, and staging areas for large equipment were established on the Property.

75. The Property continues to be contaminated by hazardous and toxic substances, including without limitation and upon information and belief microplastics, VOCs, SVOCs, TPH, Metals, Radionuclides, Carbon Fibers, and PFOA and PFAS that have resulted in a diminution in value of the Property.

76. Ms. Wilson's use of the Property was curtailed for at least 191 days during initial remediation, and her access and use will be restricted in the future as a result of the ongoing contamination.

77. Although the initial aircraft crash was a singular event, the Government's conduct constitutes a continuing physical occupation of the property through the presence of debris and contaminants.

78. Without appropriate remediation, this occupation, including by "forever chemicals," is permanent and inevitably recurring.

## COUNTS

### COUNT ONE
### NEGLIGENCE

79. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

80. At all relevant times, Col. Charles Del Pizzo was an employee of the United States Government, acting within the scope of his employment as a military pilot for the United States Marine Corps.

81. Col. Del Pizzo owed a duty of reasonable care in the operation of the F-35B fighter jet, including the duty to properly diagnose and respond to in-flight emergencies and to prevent the aircraft from crashing into the property of others.

82. Col. Del Pizzo breached this duty by negligently misdiagnosing an out-of-control flight emergency, which the USMC has acknowledged constituted pilot error, resulting in the uncontrolled crash of the F-35B onto Plaintiff's Property.

83. In addition, once DON established a remediation plan, including the performance levels and specifications for remediation, DON could not deviate from that plan.

84. At no point was DON authorized to continue damaging Plaintiff's property by further altering the terrain and landscape through the destruction of resources, and the creation of roadways and staging areas.

85. As a direct and proximate result of Defendant's negligence, including that of Col. Del Pizzo, Plaintiff has suffered damages including, but not limited to:

a. contamination of soil, and upon information and belief, water and air, from jet fuel, hydraulic oil, lubricating oil, microplastics, and other hazardous substances;
b. destruction of agricultural crops and timber;
c. physical damage to the landscape and topography of the Property;
d. diminution of property value;
e. loss of use and enjoyment of the Property for at least 191 days, with future restrictions anticipated during subsequent remediation efforts;
f. loss of income from commercial agricultural and forestry operations; and
g. the need for additional environmental testing, remediation, and restoration.

86. Under South Carolina law, the law of the place where the negligent act caused damage, the United States is liable for these damages as if it were a private person. *See* 28 U.S.C. § 1346(b)(1).

**COUNT TWO**
**TRESPASS**

87. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

88. On September 17, 2023, the United States, through its employee acting within the scope of his employment, caused a physical invasion of Plaintiff's Property by crashing a military aircraft onto the land.

89. The crash deposited aircraft debris, jet fuel, hydraulic oil, lubricating oil, and other hazardous substances onto Plaintiff's Property without Plaintiff's consent.

90. Aircraft debris and other hazardous substances remain on the Property to this day as a result of the negligent conduct of the United States in causing the crash, as well as the government's deviation from the standards established for remediation, and the government's continued invasion in the property, which altered the landscape of the property.

91. The physical invasion of Plaintiff's Property was the direct result of the negligent acts of a government employee acting within the scope of employment.

92. As a direct and proximate result of this trespass, Plaintiff has suffered damages as set forth herein.

**COUNT THREE**
**NUISANCE**

93. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

94. The reckless crash of the F-35B fighter jet and the subsequent release of hazardous materials onto Plaintiff's Property constituted an unreasonable interference with Plaintiff's use and enjoyment of her Property.

95. The residual contamination, remaining debris, and alteration of the landscape continue to interfere with Plaintiff's use (both personal and commercial) and enjoyment of her Property. *See Babb v. Lee County Landfill SC, LLC*, 405 S.C. 129, 747 S.E.2d 468 (2013) (recognizing nuisance, trespass, and negligence claims could survive in a case involving environmental contamination of property).

96. As a direct and proximate result of this nuisance, Plaintiff has suffered damages as set forth herein.

**COUNT FOUR**
**INVERSE CONDEMNATION**
**VIOLATION OF U.S. CONST., AMEND. V.**

97. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

98. As indicated previously, the Fifth Amendment of the United States Constitution protects private individuals from the conscription of their land for public use without just compensation.

99. A physical invasion of private property, if continuous and ongoing, constitutes a taking.

100. Here, the Government's conduct, including the initial aircraft impact and the response, constitutes a permanent physical occupation in the following particulars:

a. The continued presence of pieces of aircraft on Plaintiff's property;

b. The continued presence of contaminants of concern in the soil, sediment, and surface water upon Plaintiff's property;

c. The continued presence of persistent and non-biodegradable contaminants upon Plaintiff's property;

d. The deprivation of the economically beneficial use of the affected portions of the property;

e. The continued inability to use the property according to its historical purpose; and

f. The permanent alteration of the structure of and natural resources upon Plaintiff's property; and

g. Such other invasions as may be revealed during discovery.

101. The government is aware of this continued contamination and property invasion.

102. As a direct and proximate result of the Government's conduct, the Plaintiff's property has been permanently impacted, including by the presence of fixed debris and contaminants, Plaintiff has suffered and continues to suffer damages including loss of the fair market value of the property, loss of use of the property, costs of the independent environmental assessment necessary to return to the property to its pre-intrusion state, and such other damages as are recoverable under the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant United States of America as follows:

A. Compensatory damages for the costs of adequate environmental remediation and restoration of the Property, including soil, water, and air testing, excavation, treatment, disposal, monitoring, and site preparation;

B. Compensatory damages for the diminution in value of the Property;

C. Compensatory damages for loss of natural resources;

D. Compensatory damages for lost income from commercial agricultural and forestry operations;

E. Compensatory damages for loss of use and enjoyment of the Property during the 191-day remediation period and any future periods of restricted access;

F. Pre-judgment and post-judgment interest as allowed by law;

G. Costs of this action; and

H. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

WYCHE, P.A.

*s/Jessica L. Fickling*
Jessica L. Fickling (Fed. ID No. 11403)
R. Brian Critzer (Fed. ID No. 13999)
807 Gervais Street, Suite 301
Columbia, SC 29201
Telephone: (803) 254-6542
Facsimile: (803) 254-6544
jfickling@wyche.com
bcritzer@wyche.com

September 1, 2026